NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                    :
JOYCE QUINLAN,                      :
                                    :
    Plaintiff,                      :
                                    :   Civil Action No. 13-7052
               v.                :
                                    :   **OPINION**
RELIANCE STANDARD LIFE              :
INSURANCE COMPANY,                  :
                                    :
    Defendant.                      :
_____ :

PISANO, District Judge.

    Plaintiff Joyce Quinlan brings this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, alleging that Defendant Reliance Standard Life Insurance Company's decision to terminate her benefits was arbitrary and capricious. Before the Court are dual motions for summary judgment brought by both Plaintiff and Defendant. The Court decides these motions without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Motion for Summary Judgment.

**I.    Background**

    Plaintiff Joyce Quinlan ("Plaintiff" or "Quinlan") was employed by Robert Wood Johnson University Hospital of New Brunswick ("Robert Wood Johnson") as Director of Benefits. Administrative Record ("AR") 155–58. On or about February 18, 2012, Plaintiff was involved in a serious car accident and sustained traumatic injury to her spinal column. *Id.* at 137–43, 167. Plaintiff stopped working on May 18, 2012, and submitted a claim for long term disability benefits, which included statements from herself, her employer, and orthopedic specialist Michael

Lospinuso, M.D.  88.  *Id.* at 137–43, 146–47, 155–58.  Dr. Lospinuso diagnosed Plaintiff with a cervical disc herniation, and performed an elective anterior cervical discectomy and fusion procedure, as well as an anterior cervical plate fixation and an anterior spinal cord decompression on June 5, 2012.  *Id.* at 146, 199, 206–08.  Plaintiff tolerated the procedure well with no complications.  *Id.* at 199, 206–08.

On June 21, 2012, Plaintiff told Dr. Lospinuso that she "feels well, but [*sic*] pain in the right upper extremity is markedly improved.  The weakness is identified but she states it is a significant outcome preoperatively[*sic*]."  *Id.* at 145.  On examination, Dr. Lospinuso found some swelling near the wound site and instructed Plaintiff to begin a six to eight week course of rehabilitation therapy to improve her lower right extremity strength, after which he planned to reevaluate her.  *See id.*  Dr. Lospinuso reported that Plaintiff "had a successful operative procedure."  *Id.*

By August 16, 2012, about two months after her surgery, Plaintiff's arm strength and neck rotation were improving and studies showed "excellent fusion mass that is coalesced."  *Id.* at  964.  While Plaintiff reported subjective complaints of upper extremity weakness, Dr. Lospinuso found, on examination, "5/5 motor strength in both upper extremities."  *Id.*  At Plaintiff's request, Dr. Lospinuso ordered additional physical therapy, but reported that Plaintiff "will consider the options about returning back to work."  *Id.*

Plaintiff returned to Dr. Lospinuso for an evaluation in December 2012, six months after the procedure.  Plaintiff complained that she was unable to engage in "repetitive motion, particularly typing and computer work."  *Id.* at 1035.  Dr. Lospinuso found that Plaintiff's gross motor functions in her upper extremities appeared to be "5/5 in both motor groups."  *Id.*  He found "some slight weakness upon the right side particularly in the C6 and triceps on the right side."  *Id.*  Dr. Lospinuso concluded his treatment record by writing:

> At this current juncture in time, the patient has had six months of rehabilitation, I have advised the patient if she chooses not to return back to the normal line of employment, she should seek a Functional Capacity Assessment Examination or quantitate the type of work that she should be able to do safely.

*Id.*

On December 21, 2012, Dr. Lospinuso cleared Plaintiff to "return to work full duty" as of January 7, 2013. *See id.* at 1027. In a separate note written the same day, Dr. Lospinuso reported that Plaintiff continued to call his office regarding her return to work:

> At this juncture in time, I have explained to the patient that she has been out of work for approximately six months for cervical spine surgery. I would find on my last examination no objective rationale to continue extended duration of out of work given the time of work she employed with the satisfactory result of the surgical procedure.
>
> If she wishes not to return to work that is under own accord, she is welcome to do so, but there is no medical justification to substantiate such.

*Id.* at 1037. Plaintiff then sought a second opinion from David B. Dickerson, M.D. Relative to her efforts to remain out of work, Dr. Dickerson wrote, "I recommend a functional capacity evaluation prior to returning her to work. This would assess how well she functions and her level of function from a work standpoint. I recommend follow up after the evaluation for further discussion of her activities." *Id.* at 1076.

On January 16, 2013, Kinematic Consultants, Inc. ("Kinematic") performed a functional capacity evaluation and determined that Plaintiff was capable of light work (i.e., a level about the sedentary requirements of Plaintiff's own occupation). *See id.* at 1086–1101, 166–171). While Kinematic found that Plaintiff had a residual grip strength deficit of 45% and a residual horizontal upper extremity strength deficit of 37%, Kinematic concluded that Plaintiff:

> demonstrates ability for Light category work (occasional life and work up to 20 lbs.) with the above noted job movement demand changes. She demonstrates ability for light administrative/supervisory duties, reviewing documents, operating carriers/policy holders, handling loads up to 20 lbs., etc. Due to [Plaintiff's] demonstrated cervical movement, it is recommended that she is allowed changes in

3

>activities during periods of prolonged repetitive end range cervical positions > 15–20 minutes (i.e. looking up/down, reaching, crouching), or static cervical positioning > 30 minutes (i.e. computer work). Due to her demonstrated strength, it is recommended that her lift load height is limited to shoulder level and below, and that her RUE is allowed changes in activities during periods of prolonged or repetitive RUE activities > 15 minutes (i.e. reaching, pushing/pulling, heavy gripping/grasping, typing). She is advised to use available devices to minimize end range cervical positioning (i.e. headset when talking using phone for prolonged periods). Due to her demonstrated balance, she should exercise caution when walking on slippery or uneven surfaces and use available handrails when climbing stairs.

*Id.* at 1101. The Kinematic examiners concluded that Plaintiff "demonstrates the ability for any work up to Light category." *Id.* On January 28, 2013, after reviewing Plaintiff's subjective complaints, reviewing the Kinematic Report, and examining Plaintiff, Dr. Dickerson recommended that "she return to light duty with ability to take a rest from time to time to move and take a small break from typing." *Id.* at 1082.

On July 11, 2012, Plaintiff submitted a claim for long term disability benefits to Defendant Reliance Standard ("Defendant" or "Reliance Standard") under group long term disability policy number LTD121622 (the "Policy"). Reliance Standard issued the Policy to Robert Wood Johnson to fund a portion of its employee welfare benefit plan. In relevant part, the Policy issued to Plaintiff states that benefits will be paid if the claimant is "totally disabled," which occurs when the claimant "cannot perform the material duties of his/her occupation" as they are performed in the national economy. *See* AR 12. In a letter dated February 20, 2013, Reliance Standard found that Plaintiff qualified as "disabled" and paid benefits to her for seven months of the twenty-four month "own occupation" term of coverage for the period from June 12, 2012 to January 28, 2013 in the amount of $5,408 per month, less required deductions. *See id.* at 604–05. However, Reliance Standard found that, after reviewing the records from Dr. Lospinuso, Dr. Dickerson, and

4

Kinematic,[1] Plaintiff no longer met the Policy's definition of "total disability" as of January 28, 2013.

By letter dated August 13, 2013, Plaintiff appealed the decision to terminate disability payment, claiming that she remained disabled. Plaintiff relied upon a functional capacity evaluation she conducted with Ellen Radar Smith. Ms. Smith is a licensed Occupational Therapist, Certified Vocational Evaluator, and a Certified Professional Ergonomist. Ms. Smith believes that the "ability to perform work associated with Sedentary physical demands depends more on one's sit, lift and carry capacities and tolerances. Sedentary work in an office environment requires the ability to maintain static hand/arm postures and to comfortably position the arms at the computer for keyboard and mouse activities, or to write." *Id.* at 1120. Ms. Smith stated that Plaintiff's current functional limitations relate to right arm weakness and not just the cervical spine, and that she cannot use the dominant right arm for office type work more than briefly without symptom exacerbation. *See id.* at 1117, 1118, 1120. Ms. Smith therefore found that Plaintiff is not capable of working at any capacity, including at the sedentary level required for Plaintiff's occupation. *See id.* at 1119.

In her appeal, Plaintiff alleged that the functional capacity evaluation performed by Kinematic had contained material deficiencies and had failed to present an accurate presentation of her condition, or of her ability to perform duties which require the repetitive use of her right arm. Plaintiff asserted that the Smith Report more accurately showed her condition, and argued that Plaintiff can no longer perform the duties of her job. *See id.* at 1107. Plaintiff further noted that she

---

[1] While the February 20, 2013 denial letter stated that it used records from the Kessler Institute, the appeal letter clarified that the actual report that was used by Reliance Standard was the functional capacity assessment prepared by Kinematic. *See* AR 1105.

had qualified for Social Security benefits, because the Social Security Administrated had determined she was permanently disabled. *See id.* at 1107.

To fully evaluate the medical record, Reliance Standard requested an independent medical examination, which was performed by Kelly Allen, M.D., a board certified physician specializing in physical medicine and rehabilitation. After reviewing the medical records and examining Plaintiff, Dr. Allen found no objective evidence of upper extremity weakness. *See id.* at 1154–67. She noted, "Sensation of the upper extremities was intact to light touch and pin. Manual muscle testing of bilateral deltoids, biceps, triceps, wrist extensors, finger flexors, and hand intrinsics are 5/5. Bicep and brachioradialis reflexes were normoactive and symmetric." *Id.* at 1161. Upon review of the competing functional capacity evaluation reports, Dr. Allen concluded that the findings contained within the Kinematic Report were more persuasive than those provided by Ms. Smith, and noted that her "examination . . . is more consistent with Dr. Lospinuso's findings, in that, there are no objective findings to indicate any muscle weakness of the upper right extremity. No further treatment at this juncture would be warranted." *See id.* at 1164. Dr. Allen found that "Plaintiff's return to work should follow the guidelines as outlined in her initial functional capacity evaluation where she at least be allowed to alter her position after looking up or down for greater than 15-20 minutes at a time. . . ." *Id.* Dr. Allen commented that "the majority of [Plaintiff's] social security application indicated that she was unable to type and perform her normal duties on a computer secondary to right biceps weakness. However, none was found on my examination today." *Id.*

To determine whether Plaintiff is capable of performing her occupation as it is defined by the national economy, Reliance Standard also obtained an independent labor market survey. Specifically, the survey centered on the following:

> Could this position be performed within the following parameters: Light category work (occasional lift and work up to 20 pounds) allowed changes in activities;

6

>     demonstrates ability for light administrative/supervisory duties, reviewing documents, operating computers, preparing reports, consulting with insurance carriers/policy holders, handling loads up to 20 pounds etc.; allowed changes in activities during periods of prolonged or repetitive end range cervical positioning > 15 to 20 minutes (i.e. looking up/down, reaching crouching) or static cervical positioning > 30 minutes (i.e. computer work); due to demonstrated strength, it is recommended that her lift load height is limited to shoulder level and below, and that her right upper extremity is allowed changes in activities during periods of prolonged or repetitive RUE activities > 15 minutes (i.e. reaching, pushing/pulling, heaving gripping/grasping, typing); use available devices to minimize end range cervical positioning (headset when talking using phone for prolonged periods of time); due to her demonstrated balance, she should exercise caution when walking on slippery or uneven surfaces and use available handrails when climbing stairs?

*Id.* at 1170.  Seventy-two employers of Compensation/Benefit Managers were contacted and each one confirmed that the occupation can be performed with these restrictions and limitations, such as an opportunity to change positions after a period of prolonged activity, which corresponded with those recommended by Kinematic and Dr. Dickerson.  *See* AR 1170–80.

On November 7, 2013, Reliance Standard upheld its decision to discontinue the long term disability benefit based on the record evidence.   The final decision letter explained that Reliance Standard's decision was based upon the findings of Dr. Allen and Plaintiff's treating physicians, both of whom concluded that she was capable for working in her own occupation.  The final decision letter also explained that it was based upon the national labor survey, which found that her occupation could be performed even with the restrictions recommended by Dr. Dickerson, Kinematic, and Dr. Allen.  *Id.* at 618–25.

Plaintiff exhausted her administrative remedies, and this lawsuit followed.  Plaintiff has filed a one-count Complaint, seeking benefits allegedly due under the Policy.  Because Reliance Standard issued the Policy to Robert Wood Johnson to fund a portion of its employee welfare benefit plan, Plaintiff's claims are governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*

**II.     Standard of Review**

    **A.**     ***Summary Judgment Standard***

Federal Rule of Civil Procedure 56(a) provides that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law identifies which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249. While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be no genuine issue of material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quotation omitted). If the non-moving party fails to demonstrate proof beyond a "mere

scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment.  *Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

      **B.**    *Standard of Review in a Denial of Benefits Claim under ERISA*

Plaintiff filed suit under § 502(a)(1)(B) of ERISA, which allows the beneficiary of a covered policy to bring a civil action to recover benefits due under the terms of the relevant plan. 29 U.S.C. § 1132(a)(1)(B).  Courts review the denial of benefits under ERISA "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, (1989).  Where, like here, the plan document gives the fiduciary discretion to determine eligibility for benefits, courts apply the deferential arbitrary and capricious standard of review.  *See O'Sullivan v. Metropolitan Life Ins. Co.*, 114 F. Supp. 2d 303, 307 (D.N.J. 2000) (citing *Firestone Tire*, 489 U.S. at 115; *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am.*, 222 F.3d 123, 128–29 (3d Cir. 2000)).

"An administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (internal quotations omitted).  Substantial evidence exists when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (internal quotations omitted) (citing *Soubik v. Dir., Office of Workers' Comp. Programs*, 366 F.3d 226, 233 (3d Cir. 2004)).  "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits."  *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation omitted).  "[U]nder most circumstances, 'the record for arbitrary-and-capricious review of ERISA benefits denial is the record made before the plan administrator, and cannot be supplemented during

9

litigation.'" *Howley v. Mellon Financial Corp.*, 625 F.3d 788, 793 (3d Cir. 2010) (quoting *Kosiba v. Merck & Co.*, 384 F.3d 58, 67 n.5 (3d Cir. 2004)); *see also Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997) ("Under the arbitrary and capricious standard of review, the 'whole' record consists of that evidence that was before the administrator when he made the decision being reviewed.").

When the administrator has both discretionary authority and makes payments under the plan, there is a conflict of interest that courts should weight "as a factor in determining whether there is an abuse of discretion." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (internal quotations omitted). Such a structural conflict, however, does not change the standard of review from deferential to *de novo*. *Id.* at 115–16.

In the present case, both sides agree that Defendant is a fiduciary with discretionary authority to determine Plaintiff's ability for benefits under the Policy and therefore this Court should apply the arbitrary and capricious standard to Defendant's decision to deny long term benefits to Plaintiff. Defendant also pays out benefits under the Policy and accordingly has a financial interest in decisions to deny or grant benefits. Therefore, the Court considers this structural conflict of interest when reviewing Defendant's decision.

**III. Analysis**

Here, Reliance Standard found that Plaintiff qualified as totally disabled until January 28, 2013, at which point it terminated disability benefits for Plaintiff. Under the terms of the Policy, Plaintiff was required to submit satisfactory proof of disability to Reliance Standard for each period in which she claims entitlement to benefits. *See* AR 17, 21. In other words, to receive a monthly benefit, Plaintiff had to prove she was incapable of performing the material duties of her occupation as a Director of Benefits after January 28, 2013. *See Mitchell*, 113 F.3d at 439–40 (explaining that

10

a claimant bears the burden of proving disability if required by the terms of the policy); *Molinaro v. UPS Health & Welfare Package*, 918 F. Supp. 2d 291, 295 (D.N.J. 2013) ("The plaintiff retains the burden to prove that he is entitled to benefits, and that the plan administrator's decision was arbitrary and capricious."); *Zurawel v. Long Term Disability Income Plan for Choices Eligible Emples. of Johnson & Johnson*, Civil Action No. 07-5973, 2010 U.S. Dist. LEXIS 10208, at *34 (D.N.J. Sept. 27, 2010) ("It is not Defendants' burden to determine the existence of Plaintiff's disability; it is enough that they determine, reasonably, that Plaintiff has failed to satisfy his burden of proof.").

Therefore, to determine whether Plaintiff carried her burden, the Court reviews the record as a whole to determine whether the denial of Plaintiff's long term benefits was arbitrary and capricious. Defendant argues that the record clearly shows that it reviewed and considered Plaintiff's application for benefits and that its denial of benefits is based on the medical evidence provided, which includes three physicians' reports (including an independent medical examination), a functional capacity evaluation, and a national labor survey. Plaintiff, however, claims that Defendant's decision was not based on substantial evidence, in large part because it relied upon the decision of Dr. Allen. Plaintiff asserts that Dr. Allen's findings were inconsistent with the record evidence and erroneously at odds with the opinion of Ms. Smith. Specifically, Plaintiff asserts that there was substantial evidence that showed she had muscle weakness in her upper right arm extremity which would prevent her from returning to her prior level of employment, including (1) the Smith Report; (2) evidence of limited grip strength as reported in the Kinematic functional capacity evaluation; (3) a January 24, 2013 note by the Kessler Rehabilitation Center that showed a deficit in Plaintiff's right hand strength; (4) a note from June 11, 2012, from Dr. Lospinuso that

noted that Plaintiff was experiencing upper right extremity weakness; and (5) a note from January 24, 2013 from Dr. Dickerson that recorded right upper arm extension weakness.

The Court, having reviewed the record supplied, finds that Defendant's denial of benefits is not arbitrary and capricious; rather, the undisputed record shows that Defendant engaged in an in-depth review of Plaintiff's medical records, had an independent medical examination performed on Plaintiff, and appropriately concluded that Plaintiff was not eligible for long-term disability benefits after January 28, 2013.  First, several of Plaintiff's assertions regarding objective proof in the record regarding muscle weakness in her right upper arm extremity that would prevent her from returning to work are disputed by the record.  While the Kinematic Report did find evidence of limited grip strength by Plaintiff, the report concluded that Plaintiff still demonstrated the capacity for full-time work.  *See* AR 1086–1101.  Next, the January 24, 2013 note from the Kessler Institute that showed a deficit in Plaintiff's right hand strength was actually measured in a test that occurred approximately three months earlier, when Plaintiff was still eligible for and receiving benefits.  *See id.* at 1068.  Likewise, the finding by Dr. Lospinuso on June 11, 2012 that Plaintiff was experiencing upper right extremity weakness was in a note that was dictated four day before Plaintiff underwent her surgery.  *See id.* at 203.  Finally, Plaintiff references a January 2014 note from Dr. Dickerson reporting right upper arm extension weakness.  Plaintiff, however, has omitted the fact that the "weak" measurement was only a 4/5 measurement on one of six tests performed on her right arm.  On the remaining 5 tests conducted on the right side, Plaintiff measured 5/5.  Further, Dr. Dickerson recommended that, despite her upper extremity fatigability in her right upper extremity, Plaintiff was able to return to light duty work.  *See id.* at 1080.

More significantly, however, is the evidence that Reliance Standard relied on when making its determination.  Contrary to Plaintiff's assertions, a review of the final decision letter dated

12

November 7, 2013, makes clear that Reliance Standard considered the opinions of her treating physicians, Dr. Lospinuso and Dr. Dickerson. By December 2012, Dr. Lospinuso found that there was "no medical justification" for Plaintiff not to return to work. *See* AR 1037. Dr. Lospinuso likewise stated that there was "no objective rationale to continue extended duration of out of work given the type of work [Plaintiff] employed with the satisfactory result of the surgical procedure." *Id.* Despite Plaintiff's subjective complaints, he found that Plaintiff's gross motor functions in her upper extremities were "5/5 in both motor groups," despite some slight weakness on the right side. *See id.* at 1035. He cleared Plaintiff to return to work full duty as of January 7, 2013, and advised Plaintiff that, should she not wish to return to her normal line of employment, to seek a functional assessment examination. *See id.* at 1027, 1035. Likewise, after Plaintiff met with Dr. Dickerson for a second opinion, he recommended a functional capacities evaluation before Plaintiff returned to work. Kinematic performed the functional capacity evaluation on January 16, 2013 and determined that, despite certain strength deficiencies, that Plaintiff was capable of light work with certain job movement demand changes. On January 28, 2013, Dr. Dickerson reviewed Plaintiff's subjective complaints and examined Plaintiff, and reviewed the Kinematic Report. He concluded that Plaintiff was able to "return to light duty with ability to take a rest from time to time to move and take a small break from typing." *Id.* at 1082.

     Likewise, the independent medical examination conducted by Dr. Allen buttressed the findings of Plaintiff's own physicians. Dr. Allen, who specializes in physical medicine and rehabilitation, examined Plaintiff and reviewed the medical records and competing functional capacity evaluations. During her examination, Dr. Allen found "no weakness, sensory changes, or abnormal reflexes . . . in either the upper or lower extremities." AR 1164. She found that Plaintiff's "[s]ensation of the upper extremities was intact to light touch and pain. Manual muscle

13

testing of bilateral deltoids, biceps, triceps, wrist extensors, finger flexors, and hand intrinsic are 5/5. Bicep and brachioraddialsis reflexes were normoactive and symmetric." *Id.* at 1161. She concluded that her "examination today is more consistent with Dr. Lospinuso's findings, in that, there are no objective findings to indicate any muscle weakness of the right upper extremity," and recommended that her return to work should follow the guidelines in the Kinematic functional capacity evaluation, rather than the Smith Report. *Id.* at 1164.

While Plaintiff argues that Dr. Allen ignored or overlooked objective evidence of right arm weakness that existed in the claim file, the issue is whether the evidence was indicative of a disability as of January 2013. For example, as discussed above, Plaintiff points to the finding of diminished grip strength in the functional capacity evaluation conducted by Kinematic. Kinematic, however, concluded that Plaintiff had the capacity for occasional use of her dominant upper extremity for grip related tasks, and that she was capable of working in a light level occupation. *See id.* at 1099, 1101. The same is true for Dr. Dickerson and Dr. Lospinuso, both of whom concluded that Plaintiff could return to work[2] despite Plaintiff having some weakness on her right side. Accordingly, even if there was some evidence of right arm weakness, Plaintiff has failed to prove that this weakness caused her to be disabled under the terms of the Policy in January 2013.

Plaintiff, however, argues that Dr. Allen ignored the Smith Report, which she asserts accurately evaluated her ability to perform the duties of her occupation as Director of Benefits. Dr. Allen, however, did not ignore the Smith Report. Her report clearly shows that she considered the Smith Report, but rejected it after her own examination, noting that Ms. Smith's "evaluation indicated that [Plaintiff's] arm strength was so diminished that she would not be able to return to her prior level of employment. My examination is more consistent with Dr. Lospinuso's findings, in

---

[2] Dr. Lospinuso believed Plaintiff could return to work with no restrictions; Dr. Dickerson believed that Plaintiff could return to work with some restrictions.

that there are no objective findings to indicate any muscle weakness in of the right arm extremity." AR 1164.

It is true that the Smith Report found that Plaintiff's right arm weakness precluded her from performing even sedentary work, stating that "[s]edentary work in an office environment requires the ability to maintain static hand/arm postures and to comfortably position the arms at the computer for keyboard or mouse activities, or to write," and that Plaintiff cannot perform such tasks with her dominant arm without symptom exacerbation. *Id.* at 1120. Accordingly, Ms. Smith found Plaintiff to be totally disabled under the terms of the Policy. Plaintiff contends that Reliance Standard should have given some explanation for why it did not accept the findings in the Smith Report. A review of the final decision letter, however, shows that Reliance Standard did supply a reason for why it did not accept the findings in the Smith Report. It reasonably explains that it discredited the Smith Report because it "was inconsistent with all other information contained in the file," particularly with its conclusion that Plaintiff was not capable of sustaining any work function. *See* AR 624. "Under the arbitrary and capricious standard, it is recognized that the decision maker may choose to credit some evidence over other evidence." *Stith v. Prudential Ins. Co.*, 356 F. Supp. 2d 431, 440 (D.N.J. 2005). If, as in *Stith*, there was overwhelming evidence that supported the Smith Report and Plaintiff adopted a report to the contrary, a more substantial explanation might be necessary. This is simply not the case. The findings in the Smith Report were at odds with every other medical examination of Plaintiff, including the findings of her treating physician. A more substantial reason is not necessary.

Finally, Plaintiff argues that Defendant's denial letter of February 20, 2013, failed to comply with certain ERISA regulations, and therefore shows that the decision to terminate benefits was arbitrary and capricious. Under ERISA, a plan administration, upon denying a benefits claim, must

furnish the claimant with "adequate notice in writing . . . setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). The accompanying regulations require a plan administrator to provide written notification of any adverse benefit determination setting forth three things: (1) the specific reason for the adverse determination, (2) reference to the specific plan provision that formed the basis of the adverse determination, and (3) "a description of any additional material or information necessary for the claimant to perfect the claim . . . ." 29 C.F.R. § 2560.503-1(g)(1)(iii). "[A]n administrator's compliance with § 503 in making an adverse benefit determination is probative of whether the decision to deny benefits was arbitrary and capricious." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 851 (3d Cir. 2011).

In the February 20, 2013 denial letter, Reliance Standard clearly sets forth that it has determined that Plaintiff is no longer considered totally disabled under the terms of the Policy. It cites the appropriate Policy provision that it is relying on, and states that, after reviewing the records from Dr. Lospinuso, Dr. Dickerson, and Kinematic,[3] it determined that Plaintiff was capable of performing her sedentary work functions. Plaintiff, however, alleges that the letter does not advise Plaintiff what information is needed to perfect her appeal. In the letter, Reliance Standard writes that any appeal "should state any reasons why you feel the determination is incorrect, and should include any written comments, records, or other information pertaining to your claim for benefits." AR 605. Plaintiff, however, appears to argue that she was unable to determine what information was necessary to perfect her appeal. The Court disagrees. Plaintiff needed no further guidance to determine what was necessary to perfect her claim, a fact bolstered by Plaintiff's submission of the Smith Report, which was evidence that purported to show that she was still disabled under the terms

---

[3] As explained in footnote 1, *supra*, Reliance Standard stated that it used records from the Kessler Institute, but really used the Kinematic Report. *See* AR 1105.

of the Policy.  This makes this case markedly different from either *Miller* or *Connor v. Sedgwick Claims Mgmt. Servs.*, 796 F. Supp. 2d 568 (D.N.J. 2011), on which Plaintiff relies.  In both of those cases, the letters made it "exceedingly difficult for [the plaintiff] to understand, let alone challenge, the bases for [the defendant's] course of action."  *Miller*, 632 F.3d at 852; *Connor*, 796 F. Supp. 2d at 582 ("Without further guidance, it was impossible for Plaintiff to know exactly what type of objective evidence [the defendant] required her to submit so she could perfect her claim.").  Further, even if Plaintiff was completely unable to determine what information was necessary to perfect her claim, this factor would do little to sway the Court's determination that Reliance Standard's decision to terminate benefits was arbitrary and capricious considering the substantial evidence supporting the denial of benefits.

Overall, Plaintiff was required to show that she was "disabled" after January 28, 2013, to continue to receive benefits.  Considering the weight of objective medical authority that indicated Plaintiff was able to return to work with at least some restrictions, a reasonable person would find that Reliance Standard's decision to deny Plaintiff's claim was reasonable and supported by the evidence.  Further, Reliance Standard conducted a labor market survey of employers within the national economy regarding the occupations of Compensation Manager and Benefits Manager, asking the employers if the occupation could be performed with the restrictions set forth in the Kinematic Report.  Each employer that responded indicated that the position in question could be performed in light of the recommendations, adding further support to Reliance Standard's determination that Plaintiff was not disabled under the terms of the Policy.  *See* AR 12 (defining "totally disabled" as occurring when a claimant "cannot perform the material duties of his/her occupation" as they are performed in the national economy).

Implicit in Reliance Standard's finding that Plaintiff was no longer disabled under the terms of the Policy was its decision to credit the reports of Plaintiff's treating physicians, Dr. Allen, and the Kinematic Report over the Smith Report.  Reliance Standard, however, has the discretion to weigh competing evidence under the arbitrary and capricious standard.  The Smith Report was a marked outlier in its findings, and is not enough to overcome the test results that were generally normal or the opinions of Dr. Lospinuso, Dr. Dickerson, Kinematic, and Dr. Allen.  Considering the breadth of support in the record for Reliance Standard's decision, the Court cannot say that Defendant's denial was "without reasons, unsupported by substantial evidence[,] or erroneous as a matter of law." *Abnathya*, 2 F.3d at 45.  Accordingly, the Court holds that the undisputed facts establish that Defendant's denial of Plaintiff's claim for long term disability benefits under the Policy is not arbitrary and capricious.

**IV.    Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment is granted.  Plaintiff's motion for summary judgment is denied.  An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: February 9, 2014